**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
October 29, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

**J. DOE, a minor, by and through their parents and next friends, JAMES DOE and JANE DOE; and JAMES DOE and JANE DOE, individually,**

**Plaintiffs,**

**v.**

**ALBEMARLE COUNTY SCHOOL BOARD,**

**ERIN E. STONE, in her individual capacity,**

**and**

**JOSIAH M. BLACK, in his individual capacity,**

**Defendants.**

**Civil Action No.** 3:26cv115

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1. On August 19, 2025—their[1] second day at an Albemarle County high school—fifteen-year-old J. Doe, a student with autism and a specific learning disability, was sexually assaulted in class by another student. The Albemarle County School Board ("School Board" or "School Division") and its employees already knew that the assailant had been touching other students inappropriately and had taken no action to protect students from ongoing assaults.

2. What followed compounded the harm. Rather than protect a disabled child who had just been sexually assaulted, Defendants kept J. Doe in class with the assailant and told J. Doe

[1] In order to protect J. Doe's identity, the Complaint uses gender-neutral pronouns.

they could leave if they were uncomfortable. Defendants also falsely told J. Doe's parents that the School Division could not provide or fund trauma therapy. When J. Doe's outside therapist made a mandated report of the assault, the School Division's Title IX Coordinator, Erin Stone, who is also its Assistant School Division Counsel, cut J.'s in-home mental health support. Ms. Stone, along with the school principal, also communicated with the Commonwealth's Attorney to tell him how hard the process had been on the assailant. The Commonwealth's Attorney then declined to bring charges, citing the burden on the assailant's family.

3. For roughly three months, J. Doe was unable to attend school, and the School Division provided little or no instruction and little or none of the special education and related services required by J. Doe's Individualized Education Program ("IEP"). J. Doe's parents repeatedly sought help from Ms. Stone and from the IEP team, without success. When J. Doe's parents escalated their requests to Ms. Stone's supervisor, Josiah Black, to Superintendent Matthew Haas, and to the School Board, and sought a special education placement that would let J. Doe return to school, the School Board, through Ms. Stone and Mr. Black, conditioned J. Doe's annual IEP meeting and special education placement on a written agreement requiring J. Doe's parents to release every claim against the School Division and its employees, to keep the agreement confidential, to refrain from "disparaging" anyone associated with the School Division, and to communicate with the School Board only through designated staff. Ms. Stone told the parents in writing that "we need to get an agreement signed first, then your IEP team can meet."

4. Plaintiffs bring this action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.; 42 U.S.C. § 1983; and Virginia law, to remedy Defendants' deliberate indifference to known sexual harassment, their discrimination against a disabled child, and their retaliation against a family that refused to stay silent.

**PARTIES**

5. Plaintiff J. Doe ("J.") is a sixteen-year-old student who resides with their parents in Albemarle County, Virginia, and attends school within Albemarle County Public Schools ("ACPS"). J. is eligible for special education and related services under the Individuals with Disabilities Education Act ("IDEA") in the categories of autism and specific learning disability. J. is an individual with a disability within the meaning of Section 504 and Title II of the ADA. J. sues through their parents and next friends pursuant to Federal Rule of Civil Procedure 17(c).

6. Plaintiffs James Doe and Jane Doe (together, "the Parents") are J.'s father and mother. They reside in Albemarle County, Virginia, and sue on J.'s behalf as their next friends and in their own right.

7. Defendant Albemarle County School Board is a body corporate under Va. Code § 22.1-71 responsible for the supervision of ACPS, which includes all schools attended by J. during the relevant time period. The School Board receives federal financial assistance and is a public entity within the meaning of 42 U.S.C. § 12131(1). The School Board is a "person" subject to suit under 42 U.S.C. § 1983.

8. Defendant Erin E. Stone was employed by the School Board as both its Title IX Coordinator and its Assistant School Division Counsel at all relevant times. She is sued in her individual capacity. At all relevant times she acted under color of state law.

9. Defendant Josiah M. Black was at all relevant times Chief Legal Officer for the School Division, a member of the Superintendent's Cabinet, and Ms. Stone's supervisor. He is sued in his individual capacity. At all relevant times he acted under color of state law.

**JURISDICTION AND VENUE**

10. This Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a), and supplemental jurisdiction over their state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy.

11. Venue is proper in this District and Division under 28 U.S.C. § 1391(b), and assignment to the Charlottesville Division is proper, because all Defendants reside here and the events giving rise to these claims occurred in Albemarle County, Virginia.

**USE OF PSEUDONYMS**

12. Plaintiffs proceed under pseudonyms to protect the identity of a minor who was the victim of a sexual assault and who has a disability, and to protect the privacy of other minors referenced in this Complaint. Plaintiffs are contemporaneously filing a motion for leave to proceed under pseudonym. *See James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993); *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014); Fed. R. Civ. P. 5.2(a)(3). Defendants know Plaintiffs' true identities.

13. The student who assaulted J. is referred to as "Student A." The other student assaulted by Student A at the same time as J. is referred to as "Student B."

**FACTUAL ALLEGATIONS**

<u>J. entered high school after years of progress</u>

14. J. attended School A through ninth grade. There, J. made remarkable progress. J. mastered their self-advocacy goal, increased their time on task to that of same-age peers,

learned to express their needs verbally and to self-regulate without staff support, no longer needed a behavior support plan, and was able to ride the general education bus.

15. J. nonetheless continued to require special education and related services entering tenth grade. J.'s IEP dated August 8, 2025, documents that they benefit from adult support when frustrated or anxious, need support with executive functioning, and require weekly psychological services to help them verbalize frustration and anxiety and develop self-regulation strategies. The IEP records the school psychologist's observation that J. "can become fixated on a single aspect of a problem scenario which can be a barrier to [their] success."

16. J. had previously required homebound instruction in middle school because of anxiety. The School Division knew that J. had documented anxiety and emotional-regulation needs and depended on consistent adult support.

17. For the 2025–2026 school year, J. enrolled at School B and School C, attending each on alternating days. J. enrolled at School B so that J. could attend a specialized program at School C.

<u>The School Division knew Student A was touching other students and did nothing</u>

18. Student A is a student with a disability who attended an ACPS middle school before enrolling at School B for the 2025–2026 school year.

19. Student A's middle school case manager, an ACPS employee, observed Student A touching other students in her classroom during the 2024–2025 school year and described him as very "handsy." She relayed these observations to Student A's case manager at School B.

20. Upon information and belief, before August 19, 2025, multiple ACPS staff members observed Student A touching other students inappropriately even after being told to stop.

21. Upon information and belief, before August 19, 2025, the School Division did not investigate whether Student A's conduct constituted sexual harassment, refer the matter to its Title IX Coordinator, impose discipline or corrective measures, implement a behavior or safety plan, increase supervision, or make any report to Child Protective Services or law enforcement.

Student A sexually assaulted J. on their second day at School B

22. On August 19, 2025—J.'s second day at School B—Student A sat between J. and Student B in an elective class, which met in the school auditorium. When the lights went down, Student A put his arms around both students and began groping them. Student A placed his hand on J.'s inner thigh, moved it up to J.'s genitals, and fondled J.

23. Student B reported the assault to the school counselor that same day. Student B told the counselor that Student A had touched him and others in class, pointed to his genital area, and said the touching was sexual.

24. The school counselor notified the Assistant Principal, who notified the Principal. The Principal and Assistant Principal then called Defendant Black, Chief Legal Officer, and notified him of the reported assault.

25. Based on guidance from Defendant Black, none of them reported the assault to Child Protective Services or to law enforcement, despite Virginia's reporting requirements, including Va. Code §§ 22.1-279.3:1 and 63.2-1509. Even after additional reports of sexual assault by Student A, no ACPS employee has ever reported the assaults to Child Protective Services or law enforcement.

26. In the weeks following J.'s assault, Student A continued touching others. For example, a teaching assistant saw Student A "grabbing and groping" another student under a desk, touching what appeared to be the student's upper inner thigh, and saw Student A touch other students "numerous times." Teaching assistants reported Student A's touching to his case manager. The case manager and school counselor responded, at most, by telling Student A that "unless it's a fist bump" he should not touch other students. In addition to School Division employees directly witnessing Student A touching others inappropriately, other students also made various reports in the weeks following J.'s assault. On August 20, September 1, and September 17, 2025, ACPS received reports through its "HelpMe" reporting application concerning Student A. Upon information and belief, no mandated report was made as to any of these incidents.

Defendants kept J. in class with the assailant

27. On August 20, 2025, Defendant Stone and the Principal called J.'s parents to tell them that another student had reported that Student A had his hand on J.'s inner thigh. Defendant Stone and the Principal did not tell J.'s parents that touching of the genitals had also been reported. J. had not yet disclosed the assault to their parents.

28. During that call, the Parents told Defendant Stone and the Principal about J.'s autism, J.'s history of anxiety, and J.'s prior need for homebound instruction, and asked that J. and Student A be placed in separate classes. They agreed to meet the following day to discuss further. Defendant Stone expressed openness to the requests from the Parents but stated that she would need to check with her supervisor, Defendant Black.

29. J. was too distressed to attend School C on August 20, 2025. The Parents asked that day for an immediate IEP amendment to add daily counseling from the school psychologist.

Defendant Stone discouraged involvement of the IEP team, responding that extra counseling could instead be provided as a Title IX supportive measure without amending the IEP, writing that the IEP process "isn't as agile as putting a supportive measure in place," and that "[w]e will keep the extra counseling in place as long as you feel it is warranted as a supportive measure. If that becomes overly burdensome for the school, we can discuss alternatives."

30. On August 21, 2025, the Parents met with Defendant Stone, the Principal, the Assistant Principal, a school psychologist, a school counselor, and the school's mental health provider to discuss supportive measures.

31. At that meeting, Defendant Stone refused to remove Student A from the classes he shared with J, citing guidance from Defendant Black. Instead, Defendant Stone told the Parents that Student A would remain in class with J., with an additional adult present, as a matter of "fairness," and that J. could leave class as needed if they were uncomfortable. The Parents objected, noting that seeing Student A would harm J.'s emotional well-being and safety given J.'s disabilities.

32. No written plan for supportive measures was finalized or agreed upon. The no-contact document the School Division shared had been drafted incorrectly, with the parties reversed, and disclosed Student A's name and other personally identifiable information to the Parents. Defendant Stone collected the copies. The School Division’s only additional reassurance was that Student A would be absent for the rest of the week for dental surgery.

33. J. attended School B on August 21, 2025, but became so triggered that they had to leave their third- and fourth-period classes to seek support. That night, J. suffered panic attacks

and could not fall asleep until after 1:00 a.m. When J. learned they would remain in class with Student A, J. understood that they would have to leave if they felt unsafe, and they feared they were being punished for having been touched.

34. J. was unable to return to School B for a typical school day after the assault. J. attempted to attend School C on several occasions following the assault but could not remain or attend consistently for many months. As a result, J. was effectively excluded from school.

35. The School Division's response also failed to protect Student B. Student A remained in an elective class with Student B, continued trying to touch Student B, and, on August 28, 2025, followed Student B into a bathroom, where the two students fought.

<u>Defendants misrepresented available services and withdrew J.'s support after a mandated report</u>

36. J.'s IEP team met on August 22, 2025. The team agreed to two weeks of daily, in-home mental health support from School B's mental health provider. School B's mental health provider told the team that J. needed trauma therapy that she could not provide.

37. The Parents asked ACPS to provide or fund a trauma therapist. Defendant Stone insisted that ACPS could not provide trauma therapy, could not fund outside trauma therapy, and does not pay for private therapy. On September 2, 2025, she wrote that "the county cannot assist with private therapy" and that "what we can offer is counseling through existing school resources."

38. Those statements were false. ACPS had trauma therapy providers available to it as direct-payor providers, including the provider who ultimately treated J. Upon information and belief, ACPS had previously funded private therapeutic services for another student in a Title IX matter because no appropriate ACPS provider was available.

39. School B's mental health provider did not deliver the agreed daily services. She did not see J. in person until September 2, 2025, and saw J. in person only twice during the two-week period. ACPS failed to offer another provider. By September 15, 2025, J. had received only three counseling sessions.

40. On August 26, 2025, J. disclosed to the Parents that Student A had stroked J.'s inner thigh. Prior to this, J. had not disclosed any details of the assault to the Parents. When doing so, J. broke down crying.

41. In late August 2025, J. began seeing a private licensed clinical social worker, to whom J. disclosed the assault in more detail. The therapist made a mandated report to Child Protective Services, which referred the matter to law enforcement.

42. When the Parents told Defendant Stone about the mandated report, she reacted with evident displeasure and insisted that it was her role to coordinate with law enforcement.

43. On September 4, 2025, Defendant Stone confirmed in writing that she had not made a mandated report. She told the Parents that she would make a report only once she determined that an assault had occurred. Virginia law imposes no such precondition. Va. Code § 63.2-1509 requires school employees to report whenever they have reason to suspect that a child has been abused.

44. On September 4, 2025, Defendant Stone wrote to School B staff that the School Board did "not have an obligation to provide counseling/therapy in the home," and that "I don't know of anything Title IX can provide beyond what you all are doing." This was after ACPS failed to deliver the in-home services that had been agreed upon.

45. On or about September 5, 2025, the Principal encouraged the Parents not to file a formal Title IX complaint, telling them that School B had funds to provide support and that it would be easier if they did not file.

46. Shortly after the mandated report, and before J. had received the agreed two weeks of daily services, Defendant Stone cut J.'s support. On September 16, 2025, Defendant Stone wrote that School B's mental health provider could be "reasonably available" only by Zoom or at School B, where J. could not go. On September 18, 2025, Defendant Stone limited J.'s support while homebound to two Zoom sessions per week and two home visits per month. Defendant Stone further insisted that if J. wanted additional in-home sessions, they could be provided at the school where the assault occurred.

47. Defendant Stone - not J.'s IEP team - made and communicated this decision. No IEP meeting was held, and the Parents did not agree to the change.

48. During this period, the School Division provided J. with little or no academic instruction. At most, J.'s case manager met with J. for a few hours a week outside school.

49. On September 30, 2025, ACPS staff held an internal meeting to "figure out what ACPS mental health resources (if any) are available to fulfill the [Parents'] request for supportive measures." Nothing additional was offered to Plaintiffs after that meeting.

50. On October 20, 2025, Defendant Stone wrote that ACPS did "not have resources reasonably available to reimburse families for private providers of choice." On October 23, 2025, she wrote: "No, we do not have a trauma therapist."

51. Upon information and belief, Defendant Black ratified all of the decisions made by Defendant Stone throughout this process.

Defendant Stone and the Principal intervened with the Commonwealth's Attorney on Student A's behalf

52. In September 2025, J. participated in a forensic interview conducted as part of the criminal investigation. The investigating detective found J.'s account credible, told the Parents that he had no doubt an assault had occurred, and said he believed sexual battery charges were appropriate, subject to the Commonwealth's Attorney's decision.

53. On or about October 20, 2025, the Parents met with the Commonwealth's Attorney. He told them that Defendant Stone and the Principal had contacted him and told him that the process had been very hard on Student A, that Student A was receiving therapy, and that Student A's family was planning to move because the situation was so difficult for them.

54. The Commonwealth's Attorney told the Parents that he did not intend to bring charges because doing so would be too hard on Student A's family. He acknowledged that he had not watched J.'s forensic interview or spoken with the detective, and that he had discussed the case only with Defendant Stone and the Principal.

55. Defendant Stone and the Principal had no legitimate educational reason to advocate to the Commonwealth’s Attorney on behalf of Student A, who sexually assaulted J. Their intervention came after the Parents had cooperated with law enforcement and declined Defendant Stone's demand to control that contact.

The Parents' complaints were dismissed

56. Student B filed a formal Title IX complaint on August 29, 2025. J. filed a formal complaint on September 11, 2025, which ACPS consolidated with Student B's.

57. On September 12, 2025, the Parents wrote to Defendant Black, Defendant Stone's supervisor, to request a different Title IX Coordinator. They cited the misdrafted no-

contact document, the disclosure of Student A's personal information, and the drastic reduction in J.'s supportive measures.

58. On September 15, 2025, Defendant Black refused. He called the assault an "unfortunate situation," addressed Jane Doe as "Attorney [Doe]" rather than as J.'s mother, and wrote that he had "reviewed [Defendant Stone's] handling of this case in detail and believe[d] she has capably served the needs of all involved while maintaining neutrality and complying with all applicable laws." Defendant Black added: "I do not believe Attorney Stone has done anything improper or unlawful." He suggested that the Parents "continue to work with our Special Education team and school administrators," which they had attempted to do for three weeks.

59. By then, J. was too distressed to sit for an interview, and the Parents had lost confidence in the Title IX Coordinator. On September 14, 2025, they withdrew J.'s formal complaint.

60. Defendant Black directed the Parents to the School Board's third-party complaint process through its Deputy Chief Human Resources Officer, Brodie Downs. When the Parents raised their concerns about Defendant Stone with Mr. Downs, he told them he could not do anything, went silent for a month, and ultimately referred them elsewhere. Mr. Downs did not investigate their complaint.

61. On October 14, 2025, the School Board's Title IX investigator issued a Notice of Directly Related Evidence in Student B's complaint. The evidence showed, for the first time to the Parents, that ACPS staff had observed Student A touching other students in middle school and at School B, that teaching assistants had reported it to his case manager, and that students had reported it through the HelpMe application.

62. In mid-October 2025, the Parents repeatedly contacted Superintendent Matt Haas requesting a meeting to share and discuss their concerns. Mr. Haas never responded. On October 22, 2025, they wrote to the School Board describing the mishandling of the matter, their repeated unsuccessful efforts to meet with the Superintendent, and J.'s continued exclusion from school, and asked for help. They received no substantive response.

63. On October 21, 2025, the Parents filed a new formal complaint. After learning that Defendant Stone and the Principal had contacted the Commonwealth's Attorney on Student A's behalf, the Parents concluded that ACPS could not conduct a fair investigation. On October 25, 2025, they withdrew the new complaint and revoked permission for ACPS to access J.'s forensic interview.

<u>The School Board conditioned J.'s IEP meeting and placement on a release of all claims</u>

64. J.'s annual IEP was due for review, and the Parents began requesting an IEP meeting on or about October 10, 2025. On or about October 23, 2025, through their educational advocate, they asked ACPS Special Education Coordinator Ruth Tapscott for an IEP meeting to consider placing J. at School C five days a week. The Parents made this request through the IEP process and never raised it with Defendant Stone.

65. Ms. Tapscott shared the Parents' IEP requests with Defendant Stone. Shortly before October 31, 2025, Defendant Stone and other ACPS staff, including members of J.'s IEP team, met without the Parents to develop a plan to present to the family in the form of a written agreement.

66. On October 30, 2025, when the Parents asked Ms. Tapscott about J.'s educational placement, she replied that Defendant Stone "has more information to share regarding

next steps for [J.]." The Parents objected that the IEP was not Defendant Stone's to discuss.

67. On October 31, 2025, Defendant Stone, writing as "Title IX Coordinator/Assistant School Division Counsel," sent the Parents a proposed agreement between the School Board and the Parents. Her cover email stated: "We are asking for some things in return." It continued: "The process is that we need to get an agreement signed first, then your IEP team can meet and incorporate the agreement terms into the annual IEP."

68. The proposed agreement offered a placement at School C for the remainder of the school year, an IEP reflecting that placement, and up to 33 hours of trauma-informed therapy. In exchange, it required the Parents, for themselves and on J.'s behalf, to:

- "release and forever discharge" the School Board and all of its "members and all officers, agents, employees, attorneys, and students," in their official and individual capacities, from "any and all complaints, claims, due process hearings, administrative complaints, demands, grievances, lawsuits, charges and actions of any kind" relating to J.'s education;
- "immediately withdraw any pending local, state, and federal administrative complaints of any kind" and agree that none would be filed for prior issues;
- keep "[t]he terms and conditions of this Agreement, the existence of the Agreement, and any negotiations and discussions that preceded its making" confidential;
- "forbear from making, causing to be made, publishing, ratifying, or endorsing any and all disparaging remarks, derogatory statements, or comments made to anyone concerning the School Board, ACPS, or its employees, students, parents of students";
- "communicate directly and solely with their assigned ACPS special education coordinator" on special education matters and "directly and solely with the Principal of [School C]" on all other matters; and
- forgo J.'s IEP counseling services while J. received the trauma therapy.

69. The agreement also provided that J.'s "stay-put" placement would remain the public day school and the August 8, 2025 IEP, so that the placement and services the School Board offered would disappear at year's end.

70. Defendant Stone told the Parents that she and Defendant Black were responsible for drafting the agreement and that the School Board had authorized it. Upon information and belief, the School Board, acting through its members or through officials to whom it delegated final authority, approved conditioning J.'s IEP meeting and placement on the agreement's terms.

71. The School Division was legally required to convene J.'s IEP team to review and revise the IEP regardless of any agreement. It had no lawful basis to condition that meeting, or J.'s access to a free appropriate public education, on a release of claims or a surrender of the Parents' rights to speak and to petition.

72. On November 2, 2025, the Parents wrote to the School Board's Chair and Vice Chair, Kate Acuff and Rebecca Berlin, Defendant Stone, and Ms. Tapscott. They explained that it was "unreasonable for the school board and ACPS to be asking us as parents and constituents to give up [J.]'s ADA, IDEA, and FAPE and other rights in order to receive the requests made by our advocate," asked that J.'s IEP be separated from any agreement, and noted that J. was "not receiving any education services on [] 'B' days." They received no substantive response.

<u>The School Division relented only after the Virginia Department of Education intervened, but the retaliation continued</u>

73. On or about November 7, 2025, the Parents contacted the Deputy Superintendent for Special Education at the Virginia Department of Education, who offered to intervene and guide ACPS away from the agreement.

74. On November 19, 2025, following the Deputy Superintendent's involvement, ACPS's special education department authorized the trauma therapy the Parents had requested since August 2025, but only 15 hours at a time, less than half of the 33 hours ACPS had

offered in the written agreement. The IEP team did not discuss or determine that limit. The IEP meeting was held the next day, November 20, 2025, and placed J. at School C five days a week. J.’s base school was changed from School B to School D.

75. J. returned to school full-time at School C after the Thanksgiving break, having missed roughly three months of school.

76. Even after the placement was settled, the School Division continued to obstruct J.'s program. School D refused to share necessary information with School C and would not reliably confirm attendance at IEP meetings, so that School C had to schedule every IEP meeting and ask School D to attend. Upon information and belief, ACPS administrators also criticized School C administrators for helping the Parents.

77. J. took online courses through Edgenuity, which require a certified teacher. After winter break, the Parents asked that a teacher meet with J. weekly. ACPS refused and provided only a teaching assistant. ACPS did not provide a teacher until the Parents raised the issue again in April 2026.

78. In May 2026, Ms. Tapscott told the Parents that ACPS would not be able to fund J.'s trauma therapy over the summer. Only after the Parents threatened to sue if J. could not access their education in the fall did ACPS authorize summer therapy.

79. The School Division also made unexplained changes to J.’s education records to remove or weaken references to the trauma that J. experienced.

80. For example, on August 5, 2026, ACPS revised J.'s transportation request form to delete the statement that, "[d]ue to a triggering incident," J.’s transportation must not include any routing through School B. As a result, ACPS failed to provide the transportation J.

required at the start of the 2026–2027 school year. ACPS restored the language only after the Parents objected.

81. Additionally, on August 28, 2026, J.'s IEP team agreed on the following language to be included in the IEP:

> Due to trauma-related triggers, [J.] experiences severe trauma responses and heightened emotional distress when witnessing physical interactions (such as peer horseplay or physical contact). This heightens [J.'s] anxiety and creates feelings of unsafe environment.

The IEP was subsequently finalized with the words "[d]ue to trauma-related triggers" removed.

<u>J. has suffered severe and lasting harm</u>

82. J.'s treating trauma therapist has diagnosed J. with post-traumatic stress disorder ("PTSD"). Upon information and belief, PTSD is associated with physical changes to the structure and function of the brain.

83. Since the assault and Defendants' response, J.'s anxiety has become extreme. J.'s social skills, self-confidence, and executive functioning have regressed. J. experiences depression, nightmares, and difficulty sleeping, and takes medication for each. J. cannot be left alone, struggles with transitions, fears strangers and travel, and has difficulty leaving the house. J. has withdrawn from friends and activities they once enjoyed.

84. J. has missed significant school. J. cannot tolerate schoolwork at home, is triggered by many topics, and has not made appropriate progress toward J.'s IEP and postsecondary transition goals. J.'s anxiety prevented them from taking the PSAT in two consecutive years and from participating in an academic competition with their School C peers. J. has also been unable to obtain a driver's license.

85. J.'s trauma therapist has recommended, at minimum, one hour per week of trauma therapy until J. graduates from high school, and ideally two hours per week. Because of J.'s autism, recovery will be slow and will take years.

86. The anniversary of the assault in August 2026 brought a marked escalation of J.'s symptoms, and the 2026–2027 school year has begun with J. struggling to attend school and stay in class.

87. The Parents have incurred substantial expenses for J.'s private therapy, evaluations, and care, have lost income taking time from work to care for J. and to advocate for J., and have suffered stress-related medical conditions. They have also been denied meaningful participation in decisions about their child's education.

The Title IX Coordinator's dual role

88. Federal regulations require a Title IX Coordinator to be free of any conflict of interest or bias for or against complainants or respondents. 34 C.F.R. § 106.45(b)(1)(iii).

89. Defendant Stone served simultaneously as the School Division's Title IX Coordinator, charged with responding impartially to J.'s report and providing supportive measures to restore J.'s access to education, and as its Assistant School Division Counsel, charged with protecting the School Division from legal liability.

90. The Parents shared detailed information about J.'s disabilities and needs with Defendant Stone believing she was a neutral official responsible for protecting their child. Defendant Stone used her position to deny services she knew J. needed, to reduce J.'s support after a mandated report exposed the School Board's own failure to report, to advocate to the prosecutor for Student A, and ultimately to seek the School Board's release from liability as the price for J.'s special education rights and services.

91. When the Parents raised concerns about Defendant Stone to Defendant Black, he reviewed her handling of the matter, approved it, refused to appoint a different Title IX Coordinator, and took no corrective action. Weeks later, Defendant Black and Defendant Stone drafted the October 31, 2025 agreement.

ACPS's systemic failure to report sexual abuse

92. On October 5, 2026, an Albemarle County grand jury indicted Defendant Stone, Brodie Downs, and a former ACPS elementary school principal, each on three counts of failing to report suspected child abuse in violation of Va. Code § 63.2-1509. Two of the charges against each of them allege a knowing and intentional failure to report information evidencing aggravated sexual battery.

93. Mr. Downs is the Human Resources officer to whom the Parents complained about Defendant Stone, and who told them he could do nothing.

94. In announcing the charges, the Albemarle County Police Department stated that its investigation revealed that ACPS teachers and staff were hesitant to report suspected child abuse because they feared disciplinary action.

95. Upon information and belief, the School Board knew of Defendant Stone's approach to reports of sexual misconduct before J. was assaulted. In March 2025, Defendant Stone reported to the School Board regarding allegations of inappropriate conduct toward students by another ACPS employee, and that matter was not opened as a Title IX case. That employee was later charged with multiple felony sex offenses against children.

96. After Defendant Stone's indictment, ACPS named an interim Title IX Coordinator. Defendant Stone remains employed by the School Board as Assistant School Division Counsel.

97. In a public statement issued on October 17, 2026, the School Board acknowledged that Va. Code § 63.2-1509 imposes a legal duty on every school employee and that its procedures require employees to report suspected abuse "immediately," without "a supervisor's permission." The School Board further acknowledged that "[f]or too long, the school division has failed to invest in the essential systems and infrastructure necessary to be responsive to the needs of a school division our size," including records management and database infrastructure, and stated that ACPS had only "recently acquired a records management system" to monitor and track its Title IX investigations.

98. The investigation the School Board authorized on August 4, 2026, does not address these failures. The investigating firm was retained by the School Board's insurer "with respect to potential claims," its fees are paid by the insurer, and Defendant Black, as Chief Legal Officer, signed the engagement on the School Board's behalf and was directed to ensure the investigators' access to documents and witnesses. Its scope is limited to the School Division's response to "allegations of sexually inappropriate conduct by staff." It does not encompass student-on-student sexual harassment or the Title IX Coordinator's handling of such reports.

99. On October 27, 2026, following a resolution of the Albemarle County Board of Supervisors requesting state review, the Virginia Superintendent of Public Instruction invoked Va. Code § 22.1-23 to require ACPS to retain an independent consultant to review its policies, practices, and organizational culture related to mandatory reporting, citing "credible reports of harm done to children" and charges that "multiple leaders at the school and central office levels failed to fulfill their legal responsibilities to report suspected child abuse." That review is administrative and limited to mandatory reporting.

It does not address the School Board's assignment of the Title IX Coordinator role to its own counsel, its conditioning of special education services on releases of claims, or its retaliation against families who report sexual harassment. The Virginia Department of Education previously intervened in J.'s case, in November 2025, after the School Board conditioned J.'s IEP meeting on a release of claims.

Administrative exhaustion and pre-suit demand

100. Plaintiffs do not seek relief in this action that is available under the IDEA. They seek compensatory damages and other relief that the IDEA does not provide, and their claims are therefore not subject to the IDEA's exhaustion requirement. *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 147-48 (2023). Plaintiffs reserve all rights to pursue relief available under the IDEA through the administrative process.

101. On October 8, 2026, Plaintiffs' counsel sent the School Board, its Acting Superintendent, and Defendant Black a written demand describing these claims and inviting resolution. The School Board did not meaningfully respond.

**COUNT I**

Title IX, 20 U.S.C. § 1681(a): Deliberate Indifference Before the Assault
(J. Doe against the School Board)

102. Plaintiffs incorporate paragraphs 1 through 100.

103. The School Board receives federal financial assistance and operates an education program or activity within the meaning of 20 U.S.C. § 1681.

104. Before and after August 19, 2025, the School Board, through employees with authority to address Student A's conduct and institute corrective measures, had actual knowledge that Student A was engaging in ongoing, unwelcome touching of other students that a reasonable official would recognize as sexual harassment.

105. The School Board's response to that knowledge was clearly unreasonable in light of the known circumstances. It did not investigate, refer the matter to its Title IX Coordinator, discipline or correct Student A, increase supervision, or separate him from other students.

106. The School Board exercised substantial control over Student A and over the classroom context in which he assaulted J.

107. The School Board's deliberate indifference caused J. to endure sexual harassment.

108. The harassment was so severe, pervasive, and objectively offensive that it deprived J. of access to the educational opportunities and benefits the School Board provides. It resulted in J.'s physical exclusion from School B and, for roughly three months, from school altogether.

109. As a direct and proximate result, J. has suffered damages, including physical injury in the form of post-traumatic stress disorder, past and future medical and therapeutic expenses, lost educational opportunities, and diminished future earning capacity.

**Count II**

Title IX, 20 U.S.C. § 1681(a): Deliberate Indifference After Notice of the Assault
(J. Doe against the School Board)

110. Plaintiffs incorporate paragraphs 1 through 100.

111. No later than August 19, 2025, the School Board, through officials with authority to address the harassment and institute corrective measures on its behalf, including the Assistant Principal, the Principal, Defendant Black, and Defendant Stone, received reports that objectively alleged that Student A had sexually assaulted J.

112. Student A's sexual assault of J. was sufficiently severe, pervasive, and objectively offensive to deprive J. of access to the School Board's educational opportunities and benefits.

113. The School Board responded with deliberate indifference. Its response was clearly unreasonable in light of the known circumstances because, among other things, it:

- refused to remove Student A from J.'s classes and instead placed on J., a student with autism and anxiety, the burden of leaving class to avoid the assailant;
- failed to finalize or implement any written supportive-measures plan;
- falsely represented that it could not provide or fund trauma therapy;
- failed to deliver the daily support it agreed to provide and then reduced J.'s support after a mandated report;
- discouraged the Parents from filing a formal complaint and from coordinating directly with law enforcement;
- failed to report the assault to Child Protective Services or law enforcement, and announced that it would report only after its own determination that an assault had occurred;
- advocated to the Commonwealth's Attorney on behalf of Student A;
- entrusted its response to a Title IX Coordinator who was also its own litigation counsel;
- failed to protect Student B or to address continuing reports about Student A; and
- conditioned J.'s IEP meeting and placement on a release of claims.

114. The School Board's deliberate indifference made J. more vulnerable to harassment and further contributed to and prolonged the deprivation of J.'s access to educational opportunities, including roughly three months of exclusion from school.

115. As a direct and proximate result, J. has suffered the damages described in paragraph 108.

**Count III**

Title IX, 20 U.S.C. § 1681(a): Retaliation
(All Plaintiffs against the School Board)

116. Plaintiffs incorporate paragraphs 1 through 100.

117. Plaintiffs engaged in activity protected by Title IX, including reporting the sexual assault, requesting supportive measures, filing formal Title IX complaints, cooperating with law enforcement, complaining about the Title IX Coordinator's conduct to

Defendant Black, Human Resources, and the School Board, and seeking assistance from the Virginia Department of Education.

118. The School Board, through Defendants Stone and Black and other employees, took materially adverse actions against Plaintiffs because of that activity, including:

- reducing J.'s mental health support shortly after the mandated report and the Parents' refusal to let Defendant Stone control their contact with law enforcement;
- advocating to the Commonwealth's Attorney against the prosecution of J.'s assailant;
- conditioning J.'s IEP meeting and placement on a release of all claims, the withdrawal of administrative complaints, confidentiality, non-disparagement, and restrictions on the Parents' communications;
- after the Parents refused to sign, authorizing less than half of the trauma therapy it had offered in exchange for a release; and
- obstructing coordination of J.'s program, withholding a required teacher, threatening to discontinue summer therapy, and altering J.'s transportation and IEP documents without the Parents' consent.

119. These actions, individually and cumulatively, would dissuade a reasonable student or parent from reporting sexual harassment or opposing a school's response to it. Actions directed at J. because of the Parents' protected activity are also actionable.

120. A causal connection exists between Plaintiffs' protected activity and these actions, as shown by their close timing, by the express link between the release and the IEP meeting, and by the School Board's reduction of services after the Parents refused to sign.

121. As a direct and proximate result, Plaintiffs have suffered damages, including J.'s lost educational opportunities and therapeutic services and the Parents' out-of-pocket expenses and lost income.

**Count IV**
Section 504 of the Rehabilitation Act, 29 U.S.C. § 794
(J. Doe against the School Board)

122. Plaintiffs incorporate paragraphs 1 through 100.

123. J. is an individual with a disability. J. has autism, a specific learning disability, and anxiety, which substantially limit major life activities including learning, concentrating, thinking, communicating, and interacting with others. J. is otherwise qualified to participate in the School Board's educational programs.

124. The School Board receives federal financial assistance.

125. The School Board excluded J. from participation in, denied J. the benefits of, and subjected J. to discrimination in its educational programs solely by reason of J.'s disability. Among other things, it:

- refused the reasonable modification of separating J. from the assailant despite knowing that J.'s disabilities made a "leave as needed" arrangement unworkable;
- left J. without instruction or meaningful services for roughly three months after disability-related trauma responses prevented J. from attending school;
- falsely denied the availability of trauma therapy and, when it finally authorized therapy, capped it without an individualized determination;
- reduced J.'s services through a non-IEP-team administrator, bypassing the evaluation and placement procedures required by 34 C.F.R. §§ 104.35 and 104.36;
- conditioned J.'s IEP meeting and placement on a release of claims; and
- failed to provide the teacher that J.'s program required until the Parents forced the issue.

126. The School Board acted with deliberate indifference to J.'s federally protected rights. Officials with authority to address the discrimination had actual knowledge of J.'s disabilities and needs, of the substantial likelihood that their actions would violate J.'s rights, and of the Parents' repeated requests, and failed to act.

127. As a direct and proximate result, J. has suffered the damages described in paragraph 108.

**Count V**
Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132
(J. Doe against the School Board)

128. Plaintiffs incorporate paragraphs 1 through 100 and 122 through 125.

129. J. is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2). The School Board is a public entity.

130. By reason of J.'s disability, the School Board excluded J. from participation in, and denied J. the benefits of, its services, programs, and activities, and subjected J. to discrimination, including by failing to make reasonable modifications necessary to avoid discrimination on the basis of disability, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7)(i).

131. The School Board acted with deliberate indifference to J.'s federally protected rights.

132. As a direct and proximate result, J. has suffered the damages described in paragraph 108.

**Count VI**
Retaliation and Interference Under Section 504 and Title II,
34 C.F.R. § 104.61 and 42 U.S.C. § 12203
(All Plaintiffs against the School Board)

133. Plaintiffs incorporate paragraphs 1 through 100 and 116 through 119.

134. Plaintiffs engaged in protected activity under Section 504 and the ADA, including requesting disability-related services, accommodations, and an IEP meeting and placement for J., and opposing the School Board's practice of conditioning those services on a release of claims.

135. The School Board retaliated against Plaintiffs because of that activity through the adverse actions described in paragraph 117.

136. The School Board also coerced, intimidated, threatened, and interfered with Plaintiffs in the exercise and enjoyment of rights protected by Section 504 and the ADA, in violation of 42 U.S.C. § 12203(b), by conditioning J.'s IEP meeting and placement on the Parents' release of their disability-rights claims, withdrawal of administrative complaints, and silence.

137. As a direct and proximate result, Plaintiffs have suffered the damages described in paragraph 120.

**Count VII**

42 U.S.C. § 1983: First Amendment Retaliation and Unconstitutional Conditions
(All Plaintiffs against Defendants Stone and Black, in their individual capacities, and the School Board)

138. Plaintiffs incorporate paragraphs 1 through 100.

139. Plaintiffs engaged in speech and petitioning protected by the First Amendment, including reporting a sexual assault, filing formal Title IX complaints, complaining to Defendant Black, Human Resources, and the School Board about the handling of the assault, cooperating with law enforcement, and seeking help from the Virginia Department of Education.

140. Defendants took the following actions that adversely affected Plaintiffs' exercise of those rights and that would deter a person of ordinary firmness from exercising them:

- Defendant Stone reduced J.'s mental health support after the Parents reported the mandated referral to law enforcement and refused to let her control their contact with police.
- Defendant Stone communicated with the Commonwealth's Attorney to advocate against the prosecution of J.'s assailant after the Parents cooperated with law enforcement.
- Defendants Stone and Black drafted, and Defendant Stone presented, an agreement that conditioned J.'s legally required IEP meeting and placement on the Parents' release of all claims, withdrawal of all administrative complaints, confidentiality, agreement not to make "disparaging remarks" or "comments . .

. to anyone" about the School Board and its employees, and agreement to communicate with the School Board only through designated staff.

- After the Parents refused to sign, the School Board authorized less than half the trauma therapy it had offered in exchange for their silence.

141. A government entity may not condition a benefit, much less a benefit to which a child is legally entitled, on the surrender of constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). By conditioning J.'s IEP meeting and placement on the Parents' agreement to give up their rights to speak about, complain about, and petition the government regarding the School Board's conduct, Defendants imposed an unconstitutional condition.

142. Plaintiffs' protected activity was a but-for cause of Defendants' actions, as shown by their timing, their content, and Defendant Stone's written statement that the agreement had to be signed before the IEP team could meet.

143. Plaintiffs' rights to be free from retaliation for protected speech and petitioning, and from conditions requiring the surrender of those rights in exchange for public benefits, were clearly established at the time.

144. The School Board is liable because the agreement and the decision to condition J.'s IEP meeting and placement on the release of claims were authorized, approved, or ratified by the School Board or by officials with final policymaking authority over those matters. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

145. Defendants Stone and Black acted intentionally, maliciously, or with reckless or callous indifference to Plaintiffs' federally protected rights, warranting punitive damages. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

146. As a direct and proximate result, Plaintiffs have suffered damages, including emotional distress, humiliation, anxiety, loss of educational opportunity and services, and out-of-pocket expenses.

**Count VIII**

42 U.S.C. § 1983: Equal Protection
(J. Doe against Defendants Stone and Black, in their individual capacities, and the School Board)

147. Plaintiffs incorporate paragraphs 1 through 100.

148. The Equal Protection Clause of the Fourteenth Amendment protects students against school officials' intentional, deliberately indifferent response to known sex-based harassment. *See Feminist Majority Found. v. Hurley,* 911 F.3d 674, 701–03 (4th Cir. 2018); *Ricketts v. Wake Cnty. Pub. Sch. Sys.*, 125 F.4th 507, 525–27 (4th Cir. 2025).

149. Student A subjected J. to harassment based on sex when he sexually assaulted J.

150. Defendant Stone had actual knowledge of the assault and responded in a clearly unreasonable manner. She downplayed it, made no meaningful effort to separate J. from the assailant or to address Student A's continuing conduct, failed to report, discouraged the Parents from coordinating directly with law enforcement, advocated to the prosecutor on Student A's behalf, and penalized the family for pursuing the matter. Defendant Black, her supervisor, knew of her handling of the assault, reviewed it "in detail," approved it, and refused to replace her, and is liable as a supervisor for her conduct. Their deliberate indifference was intentional.

151. The right to be free from school officials' intentional, deliberately indifferent response to known student-on-student sexual harassment was clearly established by August 2025. See *Hurley*, 911 F.3d at 701–03; *Ricketts*, 125 F.4th at 525–26 (applying the *Hurley* standard to administrators of a public high school).

152. The School Board is liable because its policies and customs were the moving force behind the violation, including its decision to assign the Title IX Coordinator role to its own litigation counsel, its custom of not reporting sexual assaults on students to Child Protective Services or law enforcement, as reflected in paragraphs 91 through 98, and its ratification of Defendant Stone's conduct through Defendant Black, who reviewed her handling of the matter "in detail" and approved it.

153. Defendants Stone and Black acted with reckless or callous indifference to J.'s federally protected rights, warranting punitive damages.

154. As a direct and proximate result, J. has suffered damages, including emotional distress, PTSD, loss of educational opportunity, and past and future medical and therapeutic expenses.

**Count IX**

<u>Gross Negligence</u>

<u>(J. Doe against Defendants Stone and Black)</u>

155. Plaintiffs incorporate paragraphs 1 through 100.

156. School officials owe students a duty to supervise and to ensure that students can obtain an education in an atmosphere free of threats to their safety. *See Burns v. Gagnon*, 283 Va. 657, 671 (2012). Defendants Stone and Black assumed specific duties to J. when, knowing of J.'s disabilities and the assault, they undertook to implement supportive measures, a no-contact directive, and daily mental health support for J. *See id.* at 672–73.

157. Defendants Stone and Black breached those duties with an utter disregard of prudence, amounting to a complete neglect of J.'s safety, including by keeping J. in class with the assailant and telling J. to leave if they were uncomfortable; failing to implement any written safety plan; failing to address continuing reports that Student A was touching

other students; failing to make the reports required by Va. Code § 63.2-1509; withdrawing the support J. needed to return to school; and advocating to the Commonwealth's Attorney on behalf of J.'s assailant.

158. As a direct and proximate result, J. has suffered physical injury in the form of PTSD, severe emotional distress, humiliation, embarrassment, past and future medical expenses recoverable by J. under Va. Code § 8.01-36(B), and lost educational opportunities.

**Count X**
Intentional Infliction of Emotional Distress
(All Plaintiffs against Defendants Stone and Black)

159. Plaintiffs incorporate paragraphs 1 through 100.

160. Defendants Stone and Black knew that J. was a disabled fifteen-year-old who had been sexually assaulted at school and was in a mental health crisis. Knowing this, Defendant Stone intentionally or recklessly advocated to the Commonwealth's Attorney against prosecution of Student A and withdrew the support J. needed to return to school. Defendants Stone and Black then drafted, and Defendant Stone presented, an agreement conditioning J.'s IEP meeting and placement on the Parents' surrender of their legal rights and their silence.

161. This conduct was outrageous and intolerable, offending generally accepted standards of decency and morality. *See Womack v. Eldridge*, 215 Va. 338, 342 (1974).

162. As a direct and proximate result, J. and the Parents have suffered severe emotional distress. J. has been diagnosed with PTSD, and Jane Doe has developed a stress-related cardiac condition. J.'s damages also include the past and future expenses of J.'s medical care and treatment, which J. is entitled to recover under Va. Code § 8.01-36(B).

**Count XI**

Parents' Claim for Loss of Services

(James Doe and Jane Doe against Defendants Stone and Black)

163. Plaintiffs incorporate paragraphs 1 through 100 and 155 through 162.

164. Under Virginia law, an injury to a minor child gives rise to a separate cause of action in the parents for loss of the child's services during minority. *See Moses v. Akers*, 203 Va. 130, 132 (1961). Under Va. Code § 8.01-36(B), the past and future expenses of J.'s medical care and treatment are recoverable in J.'s own claims, and the Parents, who have paid and are obligated to pay those expenses, hold a lien on and right of reimbursement from any recovery by J.

165. As a direct and proximate result of the tortious conduct of Defendants Stone and Black, the Parents have lost J.'s services during minority.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and award the following relief:

A. A declaration that the School Board violated Title IX, Section 504, and Title II of the ADA, and that Defendants violated Plaintiffs' rights under the First and Fourteenth Amendments;

B. Compensatory damages against the School Board on Counts I through VIII, and against Defendants Stone and Black, on the counts asserted against them, in an amount to be determined at trial but not less than $5,000,000;

C. Punitive damages against Defendants Stone and Black, in their individual capacities on Counts VII through X, in an amount to be determined at trial;

D. Nominal damages on each count for which compensatory damages are not awarded;

E. Injunctive relief, not available under the IDEA, requiring the School Board to:

- designate a Title IX Coordinator who does not also serve as School Board or School Division counsel or in any other role presenting a conflict of interest; and that the Title IX Coordinator not be supervised by, or report to, the School Division's legal office;
- adopt and enforce a written policy prohibiting the conditioning of special education evaluations, IEP meetings, placements, or services on a release of claims, confidentiality, non-disparagement, or restrictions on parental communication;
- adopt and enforce procedures ensuring that ACPS employees report suspected sexual abuse of students as Virginia law requires, without awaiting an internal determination;
- provide annual training to Title IX personnel, administrators, School Board members, and staff who work directly with students on recognizing and responding to peer sexual harassment, mandated reporting, and the relationship between Title IX supportive measures and obligations under Section 504 and the IDEA;
- retain an independent monitor, not engaged by or reporting to the School Board's insurer or legal office, to review and report to the Court on the School Board's compliance with Title IX and Virginia's mandated-reporting requirements; and
- refrain from retaliating against Plaintiffs;

F. Reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205;

G. Pre-judgment and post-judgment interest as allowed by law; and

H. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 29, 2026

Respectfully submitted,

J. DOE, a minor, by and through their parents and next friends, JAMES DOE and JANE DOE; and JAMES DOE and JANE DOE, individually

By Counsel

/s/ *Lauren E. Baum*
Lauren E. Baum (VSB No. 102524)
Law Office of Lauren E. Baum, P.C.
240 W. Main Street, Suite 100 - V32
Charlottesville, Virginia 22902
Telephone: (202) 450-1396
l.baum@laurenebaumlaw.com
Counsel for Plaintiffs